IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

LEOLA WILLIAMS on behalf of      )
DEONTE WILLIAMS,                  )
                                  )
        Plaintiff,                )
                                  )
v.                                )   CIVIL ACTION NO. 09-00540-N
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
        Defendant.                )


ORDER

Plaintiff Leola Williams filed this action seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") that her grandson,

Deonte Williams, was not entitled to Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act (the Act), 42 U.S.C. § § 1381-1383c. Disability was

alleged due to a "broken neck," a learning problem, neck pain headaches and behavioral

problems (Tr. 104). This action has been referred, pursuant to the consent of the parties

(doc. 18), to the undersigned Magistrate Judge (doc. 20) to conduct all proceedings and

order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73.

Plaintiff's unopposed motion to waive oral arguments (doc. 17) was granted on July 20,

2010 (doc. 19). Upon consideration of the administrative record (Doc. 12) and the

parties' respective briefs (docs. 13-14 and 15), the undersigned concludes that the

1

decision of the Commissioner is due to be **REVERSED** and the action **REMANDED** for further evaluation of plaintiff's alleged learning problem.

I. Procedural History.

Plaintiff, Leola Williams, filed an application for SSI benefits on November 27, 2006, on behalf of her grandson, Deonte Williams (collectively "plaintiff"), claiming an onset of disability as of October 25, 1996 (Tr. 88-90). Plaintiff alleges disability due to a "broken neck," a learning problem, neck pain, headaches, and behavioral problems (Tr. 104). Plaintiff's application was denied on March 5, 2007 (Tr. 38-42). A hearing before an Administrative Law Judge ("ALJ") was requested (Tr. 68).[1] Following a hearing on April 22, 2009 (Tr. 23-37), the ALJ issued an unfavorable decision (Tr. 10-22). The ALJ determined that plaintiff was not disabled as defined in the Social Security Act (Tr. 22). Plaintiff requested a review by the Appeals Council (Tr. 5). Plaintiff's request for review was denied on September 23, 2009 (Tr. 1-4), thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981 (2009). Plaintiff appeals from that decision and all administrative remedies have been exhausted.

II. Issue on Appeal.

Plaintiff alleges that the ALJ erred in rejecting the opinion of John R. Goff, Ph.D. while assigning greater weight to the opinion of Nina Tocci, Ph.D and a questionnaire

---

[1] Plaintiff had previously been awarded SSI benefits based on the injuries he incurred in an automobile accident at age three; based on a continuing disability review, these benefits were terminated as of April 2005 (Tr. 101). That decision was not appealed, and is not being contested in this action.

completed by plaintiff's teacher when the ALJ determined that plaintiff suffered from a severe impairment of borderline intellectual function. Plaintiff also alleges that the ALJ erred in finding that plaintiff has the severe impairment of borderline intellectual functioning because such was not diagnosed by any examining or treating medical source.

III. Findings of Fact and Conclusions of Law.

    A. Standard of Review.

In reviewing claims brought under the Act, this Court's role is a limited one. Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991). *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such

relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. <u>Lynch v. Astrue</u>, 358 Fed.Appx. 83, 86 (11th Cir. 2009); <u>Martino v. Barnhart</u>, 2002 WL 32881075, * 1 (11th Cir. 2002); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).

B.    <u>Applicable Law – Child Disability</u>.

The original decision in this case was made pursuant to the standards for evaluating childhood disability cases that went into effect on August 22, 1996.  On that date, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which altered the statutory disability standard for children seeking SSI benefits based on disability. *See* Pub. L. 104-193, 110 Stat. 2105 (1996) (codified at 42 U.S.C. § 1382c). The legislation, in pertinent part, provides:

> An individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in ***marked and severe*** functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(A)(3)(C)(I)(ii) (emphasis added). *See also*, <u>Encarnacion ex rel. George v. Barnhart</u>, 568 F.3d 72, 74-76 (2nd Cir. 2009)(discussing statutory and regulatory history regarding SSI benefits for disabled children).  Under Social Security regulations,

> [a]n impairment(s) causes marked and severe functional limitations if it meets or medically equals in severity the set of criteria for an impairment listed in the

Listing of Impairments [the Listing] in appendix 1 of subpart P of part 404 of this chapter, or if it is functionally equal in severity to a listed impairment.

20 C.F.R. § 416.924(d). Thus, a child's impairment or combination of impairments must meet, equal, or functionally equal a section of the Listings to be considered disabling.

To be functionally equivalent in severity to one or more of the listed impairments, a claimant's impairments must cause the same functional limitations as those described in a listed impairment, i.e. it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). This determination is made by considering a claimant's limitation of specific function, broad areas of development or function, episodic impairments, and limitations related to the effects of treatment or medication. 20 C.F.R. § 416.926a(b). Children between the ages of 3 and 18 are evaluated in terms of cognitive and communicative development, motor development, social development, personal development, and concentration, persistence, and pace; disability is established if the child has an extreme degree of restriction in one area of functioning or marked limitation in two areas of functioning. 20 C.F.R. § 16.926a(b)(2).

Although the Eleventh Circuit has not yet addressed the sequential process to be employed by an ALJ with respect to childhood disability, the Eighth Circuit has discussed the following three-step sequential process which is outlined in the regulations:

> The ALJ employs a three-step sequential process to determine whether a child is disabled. First, the ALJ determines if the child is engaged in a substantial gainful activity. 20 C.F.R. § 416.924(b). Second, if the child is not working, the ALJ determines if the child has "a medically determinable impairment(s) that is severe." § 416.924(c). And third, if the ALJ finds that the child's impairment is severe, the ALJ must then determine whether the

> impairment or combination of impairments meets or medically equals the severity of a listed impairment described in 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 416.924(d). If the ALJ finds that the child's impairment does not meet or medically equal the severity of a listed impairment, the child may still be disabled if the ALJ determines that the impairment(s) functionally equals the severity of a listed impairment. *Id.* In making his disability determination, the ALJ must consider all relevant evidence in the record. § 416.924(a) ("We consider all relevant evidence in your case record when we make a determination or decision whether you are disabled."); Reeder v. Apfel, 214 F.3d 984, 988 (8th Cir.2000) ("[T]he ALJ is not free to ignore medical evidence but rather must consider the whole record.").

Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008). *See also*, Cosby v. Comm'r of Social Sec., 231 Fed.Appx. 140, 145 (3rd Cir. 2007)(applying the regulatory three-step sequential process for determining whether a child is disabled.); Swist ex rel. Green v. Barnhart, 177 Fed. Appx. 414, 416 (5th Cir. 2006)(same); Smith ex rel. E.S.D. v. Barnhart, 157 Fed.Appx. 57, 59 (10th Cir. 2005); Pollard v. Halter, 377 F.3d 183, 189 (2nd Cir. 2004)(same); Flener ex rel. Flener v. Barnhart, 361 F.3d 442, 447 (7th Cir. 2004)(same) .

In order to establish disability due to the presence of a mental retardation, a claimant must satisfy the requirements for that listing in appendix 1, which vary depending the claimant's IQ score. *See e.g.*, Abbott v. Sullivan, 905 F.2d 918, 923-24 (6th Cir. 1990)(Most of the listings for mental impairment contained in appendix 1 impose two requirements: first, that the claimant possess certain particular signs or symptoms which are generally found in paragraph A of each listing and, therefore, referred to as the "A criteria"; and second, that the symptoms result in a specific degree of functional limitation which are set forth in paragraph B of the listings and, therefore, referred to as the "B criteria."). The listing for mental retardation contained in appendix

1 differs from nearly all of the other listings in that it does not require a claimant to satisfy the "B criteria" in all cases. 905 F.2d at 924. For example, "[t]he listing allows for a finding of disability due to mental retardation where test scores below 59 on the Wechsler Adult Intelligence Scale (WAIS) are achieved, without any direct proof of functional incapacity." *Id*. The listing for mental retardation provides specifically as follows:

> Mental Retardation: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation or function; or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following;
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05. Although the numerical values included in § 12.05 refer to results achieved on the WAIS, the listing provides that "[s]cores obtained on other standardized and individually administered tests are acceptable, but the numerical values

obtained must indicate a similar level of intellectual functioning." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.

    C.    <u>Statement of Facts</u>.

        1.    <u>Plaintiff's Alleged Impairments</u>.

Plaintiff alleges he became disabled on October 25, 1996 (Tr. 88-90), due to a "broken neck," a learning problem, neck pain, headaches, and behavioral problems (Tr. 104).

        2.    <u>Leola Williams' Testimony</u>.

Plaintiff's grandmother testified that, although she did not have legal custody of the plaintiff, she had raised him since birth (Tr. 25, 27). She testified that plaintiff was 16 years old at the time of the hearing (Tr. 26). She also testified that plaintiff no longer goes to school (Tr. 26). She described the accident she had when plaintiff, a passenger in the vehicle and three years old at the time, was injured (Tr. 27-29). She also testified that he had attended school in different places but always had trouble, particularly with reading and math (Tr. 29-30). In addition, she testified that plaintiff's mother never signed him up for special education classes, although recommended on one occasion (Tr. 30). She described plaintiff's mother as "going in and out" and finally leaving completely two to three years ago (Tr. 27, 30).

3.     <u>Testimony of Plaintiff</u>.

Plaintiff testified he had failed two grades in school, the third and seventh, and that he had quit school while repeating the seventh grade (Tr. 31).[2]  He stated that he stopped going to school because he "couldn't do the work" (Tr. 31).  He also testified that he needed a digital clock to tell time (Tr. 36).  Plaintiff also testified that he continued to have physical problems as a result of his automobile accident, including being unable to lay on his back; his back pain was a seven on a scale of zero to ten; his neck pain was also a seven on a scale of one to ten; and that he suffered from headaches "just about every day" (Tr. 32-33). He stated that the only way he can sleep is either on his left side or his stomach with three pillows (Tr. 33-34). Plaintiff testified he could walk or stand for only five minutes before he began experiencing pain, had no limitations sitting, and going up or down stairs caused his back to hurt to such a degree that he had to lie down (Tr. 34-35). According to the plaintiff, the only medication he has taken was aspirin for his headaches and Naprosyn which was prescribed by his doctor for his neck and back pain, both of which he admits help the pain (Tr. 33-34).

---

[2] Plaintiff testified that he attended kindergarten through the second grades in the Virgin Islands when he lived there with his mother and her husband (Tr. 31-32).  According to plaintiff's testimony, when he failed the third grade, he was either in Alabama where he said he lived for "awhile" or in Georgia where he said he lived "a couple of years" (Tr. 32).  Plaintiff appears to have attended the seventh grade only at "R. C. Hatch" in Alabama (Tr. 32).

4.    <u>Medical Evidence</u>.

There is no dispute regarding the following summary by the ALJ of the medical

evidence concerning plaintiff's injuries from the motor vehicle accident when he was

three or his subsequent physical evaluation and treatment:

> DCH Regional Medical Center provided treatment records of the claimant
> dated October 25, 1996, for injuries sustained in a motor vehicle accident.
> He was transported from Vaughn-Perry Hospital.  X-rays and computed
> tomography scan of the cervical spine revealed a fracture with displacement
> at C2 and displacement at C1.  The claimant was transferred to Children's
> Hospital.

> The Children's Hospital of Alabama provided records of the claimant dated
> October 25, 1996.  The claimant underwent cervical halo jacket placement
> and posterior C1-2 fusion.  He was released on November 4, 1996, with a
> diagnosis of C-2 fracture and facial lacerations.  The claimant returned on
> November 11, 1996, with infected sutures; however, his mother left without
> him being discharged.  He returned on November 13, 1996, and Dr.
> Timothy B. Mapstone reported the claimant to have done very well without
> neck pain or discomfort from the halo jacket.  The claimant returned on
> December 7, 1996, with a loose screw, which Dr. Mapstone removed.  The
> claimant was reported to be neurologically intact with no signs of infection,
> good alignment and good bone formation.  He was scheduled to return on
> Monday for halo removal and fit a hard cervical collar.  The claimant
> returned on March 26, 1997, and was doing very well and neurologically
> intact according to Dr. Mapstone's progress notes.  He reported X-rays to
> reveal excellent fusion of C1-2 with no instability at the lower level.  The
> hard cervical collar was removed, and the claimant was to return in one
> month.

> Vaughan Regional Medical Center records reveal treatment of the claimant
> on September 11, 2004, following a bicycle accident.  Pelvic and hip X-
> rays were normal.  He was diagnosed with lacerations.

(Tr. 14-15).  The ALJ also reported the following, which has not been challenged in any

manner by the plaintiff:

> Francis W. Sullivan, M.D. and Donald E. Hinton, Ph.D., completed a
> Childhood Disability Evaluation Form on March 2, 2007, and March 5,

> 2007, respectively, following review of the claimant's record of evidence. Drs. Sullivan and Hinton listed an impairment of status post neck fracture, not severe, with no limitations of functioning.

(Tr. 15). As the ALJ correctly noted, there are no records of any medical treatment of the plaintiff for his neck and back pain or headaches (Tr. 16).

Although plaintiff lists the consultative examination by Huey Kidd, DO (Tr. 190-192) as a medical report "relied upon as clinical support for disability" (doc. 14), plaintiff has not made any further reference to this report. Dr. Kidd's examination of the plaintiff at the request of the agency took place in February 2007 and revealed no cyanosis, clubbing, or edema in any extremity; plaintiff could heel walk, toe walk, bend and touch his toes, and squat and stand without difficulty; grip strength and range of motion were normal in the upper extremities; he was able to ambulate without difficulty; and he had full range of motion in the neck (Tr. 192). Dr. Kidd noted that plaintiff was taking no medication for any of his alleged impairments (Tr. 191). In addition, x-rays of Plaintiff's lumbar spine were normal, and Dr. Kidd concluded that Plaintiff had no neurological deficits (Tr. 192).

Because they are specifically relied upon by the plaintiff, special attention will be given to the reports of Nina E. Tocci, Ph.D., and John R. Goff, M.D.

a.     Nina E. Tocci, Ph.D.

Plaintiff, Deonte Williams underwent a consultative mental status examination in February 2007, performed by Dr. Tocci at the request of the agency (Tr. 187-189). The examination revealed normal speech; appropriate mood and affect; normal orientation; fair attention and scattered concentration; intact memory; a good fund of information and

11

comprehension; intact ability to abstract; appropriate thought content and process; and good social judgment and some insight into his behavior (Tr. 187-188).  Dr. Tocci opined that Plaintiff functioned within the low average range of intellectual ability (Tr. 189).

          b.    <u>John R. Goff, Ph.D.</u>

Plaintiff was examined by Dr. Goff in March 2009, at the request of his attorney (Tr. 206-213). Dr. Goff administered the Wechsler Adult Intelligence Scale (WAIS-IV), which he stated yielded a full scale IQ of 67 (Tr. 208). Dr. Goff opined that Plaintiff's mental functioning was in the mildly retarded range (Tr. 208, 210, 211).   Dr. Goff further reported that that plaintiff's verbal comprehension score of 74 and perceptual reasoning score of 71 "are at the lower end of the borderline range" (Tr. 208-209).  He additionally concluded that Plaintiff had a marked limitation in acquiring and using information; a marked limitation in attending and completing tasks; a less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; a less than marked limitation in caring for himself; and no limitation in health and physical well-being (Tr. 212-213).

          4.    <u>Other Evidence</u>.

Bridget A. Glover, plaintiff's English instructor at Robert Hatch High School, completed a "Teacher Questionnaire."  Ms. Glover noted on the form that plaintiff attended school only two to four times per month (Tr. 112-119). Ms. Glover indicated plaintiff had problems in the domain of attending and completing tasks; problems in the domain of interacting and relating with others; but that he had no problems in the domain

of acquiring and using information; no problems in the domain of moving about and manipulating objects; and no problems in the domain of caring for himself (Tr. 112-119).

5. Administrative Law Judge's Decision.

The ALJ found that plaintiff's status post fracture neck at age three, conduct disorder, borderline intellectual functioning, back and neck pain, and headaches were "severe" impairments (Tr. 13, finding No. 3), but that these impairments did not meet or equal one of listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (Tr. 13, Finding No. 4). The ALJ additionally found that plaintiff's impairments did not functionally equal a listed impairment (Tr. 13, Finding No. 5). The ALJ determined that plaintiff had the following limitations in the required domains: (1) a marked limitation in the domain of acquiring and using information; (2) a less than marked limitation in the domain of attending and completing tasks; (3) a less than marked limitation in the domain of interacting and relating with others; (4) no limitation in the domain of moving about and manipulating objects; (5) no limitations in the domain of caring for himself; and (6) no limitation in the domain of health and physical well-being (Tr. 18-21). As a result, the ALJ determined that plaintiff was not disabled as defined in the Social Security Act (Tr. 22, Finding No. 6).

D. Discussion.

1. Claims of disability due to physical limitations – abandoned.

Plaintiff  has not challenged the ALJ's determination that he does not suffer from any significant physical limitations as a result his alleged "broken neck," neck pain, back pain and headaches.  The ALJ's determination on this point is well supported not only by

Dr. Kidd's opinion that plaintiff had no neurological deficits (Tr. 191-192) but by all of the medical evidence of record (Tr. 138-144, 145-174, 175-185). Consequently, plaintiff has abandoned his claims of disability due to alleged physical impairments, and instead argues only that the ALJ erred by failing to accept not only Dr. Goff's diagnosis of mild mental retardation but his assessment of Plaintiff's functional limitations. Plaintiff's Brief (doc. 13).

### 2. Finding of "borderline intellectual functioning."

In his decision, the ALJ declared that he gave "no weight" to Dr. Goff's assessment and opinion (Tr. 16) and that he gave "substantial weight" to Dr. Tocci's assessment and "great weight" to Ms. Glover's assessment (Tr. 17). The ALJ's rationale for this allocation of preference is problematic, particularly with regard to his diagnosis of "borderline intellectual functioning."

In finding that Plaintiff suffered from *borderline* intellectual functioning, the ALJ could not reasonably rely on the opinion of Dr. Tocci because she conducted no specific IQ test and indeed concluded that plaintiff functioned within the *low average range* of intellectual ability (Tr. 189)(emphasis added). Neither the ALJ nor Dr. Tocci describe plaintiff's intellectual functioning with reference to any quantitative level for his IQ. Nor do either the ALJ or Dr. Tocci offer an specific explanation as to the basis for their opinion that plaintiff's intellectual functioning was either "borderline" or "low average." The Commissioner does not dispute plaintiff's contention that:

> According to the Diagnostic and Statistical Manual of Mental Disorders, borderline intellectual functioning is defined very simply: an IQ within the

> range of 71-84. (DSM, p. 684). There is no IQ score in the record in the range of 71-84.

Plaintiff's Brief (doc. 13) at 6.

The regulations make it clear that "[s]tandardized intelligence test results are essential to the adjudication of all cases of mental retardation [except] where your condition precludes formal standardized testing." 20 C.F.R. Part 404, Subpt. P, App. 1. The record in this case demonstrates that there was no impediment to testing plaintiff's IQ with a standardized test. Dr. Goff administered the WAIS-IV, which yielded a full scale IQ score of 67 (Tr. 208).[3] The ALJ "accorded no weight" to Dr. Goff's assessment on the grounds that it "is inconsistent with the other records of evidence" (Tr. 16-17). However, the only portion of Dr. Goff's assessment mentioned by the ALJ is Dr. Goff's diagnosis of "mild mental retardation" and Dr. Goff's conclusion that plaintiff has a "marked limitation in acquiring and using information" (Tr. 16-17). With respect to Dr. Goff's assessment of a "marked limitation in acquiring and using information," this assessment is identical to the ALJ's conclusion (Tr. 18). In addition, Dr. Goff's opinion

---

[3] Dr. Goff indicated that, while the full scale IQ score was 67 which "falls within the mildly retarded range of psychometric intelligence," the "index scores obtained were as follows: verbal comprehension – 74/4, perceptual reasoning – 71/3, working memory – 80/9, processing speed – 62/1" (Tr.208-209). According to Dr. Goff:

> The processing speed is within the mildly retarded range. The verbal comprehension and perceptual reasoning indices are at the lower end of the borderline range. The working memory index actually is a low-average score.

(Tr. 209).

regarding plaintiff's level of intellectual functioning is not only fully explained but is specifically based upon plaintiff's WAIS-IV test results which have neither been challenged nor invalidated. In contrast, the ALJ's diagnosis of "borderline intellectual function" is simply without foundation.

The only other test score contained in the record is a score of 79 obtained when plaintiff took an OLSAT test at the age 10 while in the third grade (Tr. 205). This score is the only score which could possibly relate to the ALJ's finding that "[t]he claimant was tested at school and found to have borderline intellectual functioning" (Tr. 17). However, there is no evidence in this record that an OLSAT test score of 79 overall, with a verbal score of 81 and a non-verbal score of 79, actually reflects, or was ever declared by any medical source or school official to reflect, "borderline intellectual functioning." Nor has either the ALJ in his decision, or the Commissioner in answer to this appeal, demonstrated that the OLSAT was individually administered to the plaintiff and is equivalent to the WAIS referenced in the regulations. As stated previously, the regulations provide that "other standardized and individually administered tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning [to the WAIS]." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.

Because no medical source, including Dr. Goff, made any diagnosis of "borderline intellectual functioning," the ALJ improperly made that diagnosis himself. *See* Marbury v. Sullivan, 957 F.2d 837, 840 (11th Cir. 1992)("An ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians: 'Absent a good showing of cause to the contrary, the opinions of treating

physicians must be accorded substantial or considerable weight by the Secretary'."), *quoting* Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988). Consequently, the ALJ's finding of "borderline intellectual functioning" is not supported by substantial evidence and must be reversed.

3. <u>Findings regarding plaintiff's limitations and the six domains of function</u>.

As stated previously, in order for a claimant's mental impairment to be functionally equivalent in severity to one or more of the listed impairments, claimant's impairment must cause the same functional limitations as those described in a listed impairment, i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The six domains of function addressed by the ALJ were: a.) acquiring and using information; b.) attending and completing tasks; c) interacting and relating with others; d.) moving about and manipulating objects; e.) caring for self; and f.) health and physical well-being.

The plaintiff was found by the ALJ to have a "marked" limitation in only one domain of functioning, namely that of acquiring and using information. The ALJ explains his finding as follows:

> <u>The claimant has marked limitation in acquiring and using information</u>. The claimant testified at the hearing that he failed the third and seventh grades. The claimant's grandmother testified that the claimant did not receive special education classes but always had problems with Reading and Mathematics. In evaluation with Dr. Kidd, the claimant reported being in the seventh grade in regular classes. In evaluation with Dr. Tocci in February 2007, the claimant demonstrated a good fund of information and comprehension, and his ability to abstract was intact. He demonstrated appropriate thought content and logical thought organization. Dr. Tocci opined him to function in the low average range of intelligence. Ms. Glover assessed the claimant to have no problems with acquiring and using

> information.  She reported that the claimant only came to school once every week or two without reason for absence.

(Tr. 18).   However, not one of the facts set forth by the ALJ in his rationale, either individually or in combination, support his finding of a "marked" limitation in acquiring and using information.  The fact that plaintiff  failed the third and seventh grades could as easily have been the result of indifference or his frequent unexplained absences as it could have been the result of any limitation in his ability to acquire and use information.  Plaintiff's problems with reading and math could similarly be the result of his unexplained absences and/or indifference.  Dr. Tocci's assessment that plaintiff demonstrated not only a good fund of information and comprehension but appropriate thought content and logical thought organization as well as an intact ability to abstract, certainly does not support the ALJ's finding of a "marked" limitation in acquiring and using information.  In fact, Dr. Tocci's well documented assessment[4], as well as Ms. Glover's express opinion that plaintiff had no problem with acquiring and using information (Tr. 113)[5],  appears to support a contrary conclusion that, at best, plaintiff has less than a marked limitation in this domain.

---

[4] Although Dr. Tocci may not have conducted the same tests given by Dr. Goff or specifically addressed the six domains which were addressed by Dr. Goff, Ms. Glover and the ALJ, there is no contention that she did not conduct a thorough and comprehensive Mental Status Examination which revealed that plaintiff had normal speech; appropriate mood and affect; normal orientation; fair attention and scattered concentration; intact memory; a good fund of information and comprehension; intact ability to abstract; appropriate thought content and process; good social judgment; and some insight into his behavior (Tr. 187-188).

[5] Although plaintiff's OLSAT score of 79 when he was 10 years old in the third grade cannot be deemed in this case to constitute evidence which supports the ALJ's diagnosis of "borderline intellectual functioning," plaintiff's score of 79 can be said to support a finding that (Continued)

In addition, Ms. Glover, who was plaintiff's high school English teacher, acknowledged that plaintiff had some functional limitation but opined that they were not of disabling severity (Tr. 112-119). *See* 20 C.F.R. § 416.924c(g) (information from people at school or those who have examined you, such as teachers and school psychologists, psychiatrists, or therapists, may be important sources of information about your impairment(s) and its effect on your functioning). The mere fact that Ms. Glover did not have the opportunity to observe the plaintiff more than once every week or two because of his truancy does not negate her observations of the plaintiff when he did attend school. Moreover, while plaintiff admittedly performed poorly in school, there is no indication in the record that he was ever identified by his schools as requiring special education classes or other such assistance as might be required by someone who was considered to be mentally retarded.[6] In addition, plaintiff was able to understand and respond appropriately to questions posed to him at his administrative hearing; participate fully in his consultative examinations; have friends and a girl friend; and apparently was deemed responsible enough by his own grandmother to decide on his own volition to discontinue attending school.

---

plaintiff has a less than marked limitation in his ability to acquire and use information. Plaintiff also acknowledges that during the second grading period of his repeat of the seventh grade, he made three C's and an F in reading. Plaintiff's Brief (doc. 13) at 2.

[6] The school records in evidence do no support plaintiff's testimony, and that of his grandmother, that the school tried to put him in Special Education classes but his mother simply would not sign him up for those classes (Tr. 30, 31).

In contrast to the opinions of Dr. Tocci and Ms. Glover, Dr. Goff not only opined, as did the ALJ, that plaintiff had a marked limitation in acquiring and using information, but that plaintiff had a marked limitation in the domain of "attending and completing tasks" (Tr. 212). Although the ALJ determined that Dr. Goff's opinion was entitled to "no weight" because his assessment was inconsistent with the other evidence of record (Tr. 16-17), Dr. Goff's opinion does not appear to vary significantly from that of Ms. Glover, whose opinion was given "great weight" by the ALJ. Ms. Glover's overall assessment was that plaintiff "has problems functioning in this domain" (Tr. 114). Ms. Glover then addressed and rated the same 13 individual activities involved in this domain that were considered by Dr. Goff (Tr. 212)[7] and concluded that plaintiff had "a serious problem" with one activity, namely the ability to "refocus[] to task when necessary" and "a very serious problem" with the following four activities: "focusing long enough to finish assigned activity or task"; completing class/homework assignments"; completing work accurately/without careless mistakes"; and working at reasonable pace/finishing on time." Whether these five serious to very serious problems identified by Ms. Glover out of the 13 activities comprising the domain identified as "attending and completing tasks" should be held to equate with a "marked" limitation as opposed to the ALJ's finding of

---

[7] Dr. Goff did not individually rate each activity as did Ms. Glover. *Cf.* Tr, 212 and 114.

"less than marked limitation" requires remand for further evaluation and consideration by the Agency.[8]

Although an ALJ may under some circumstances discount the opinion of a medical source, the ALJ in this case has failed to show good cause either to give "no weight" to the opinion of Dr. Goff or to give "substantial weight" to Dr. Tocci's assessment. *See* Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987) (good cause to discount a physician's opinion where it was not bolstered by the evidence, or where the evidence supported a contrary finding); Ellison v. Barnhart, 355 F.3d 1272, 1275-76 (11th Cir.2003) (per curiam), *citing* Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981)(holding that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion"). Neither Dr. Goff's assessment or Dr. Tocci's assessment is substantially supported by the evidence of record. Unlike Dr. Goff, Ms. Glover reported no limitations in the area of plaintiffs ability to acquire and use information (Tr. 113), a finding confirmed by Dr. Tocci (Tr. 188), although Ms. Glover did identify a number of problems in the area of "attending and completing tasks." Unlike Ms. Glover and Dr. Goff, Dr. Tocci did not specifically assess plaintiff's

---

[8] There does not appear to any contention that plaintiff has a "marked" limitation in any other domain. The ALJ's finding of "less than marked" limitation in the area of "interacting and relating with others" is supported by both Dr. Goff and Ms. Glover (Tr. 115, 212), and perhaps by Dr. Tocci (Tr. 188-189). All sources agree that plaintiff has no limitation in the area of "moving about and manipulating objects" (Tr. 20.116, 213). Although the ALJ and Ms. Glover agree that plaintiff has no limitation in the area of "caring for yourself" (Tr. 21, 117), Dr. Goff found plaintiff to have a "less than marked limitation" in this area (Tr. 213). In contrast, dr. Goff found "no limitation" in the area of "health and physical well-being" while the ALJ found plaintiff to have a "less than marked limitation" (Tr. 21) and Ms. glover offered to opinion (Tr. 118).

limitations in the six domains of function. Dr. Tocci cites no specific support for her contention that plaintiff "appeared to be functioning at the low average range of intellectual ability" (Tr. 189). Although Dr. Goff concludes that plaintiff's "academic achievements levels are well below expectation in all areas" (Tr.210), there is no mention anywhere in Dr. Goff's report that plaintiff only attended school once every week or two, a factor that would surely affect overall achievement.

In addition, the fact that Dr. Goff's opinion was solicited by plaintiff's attorney, despite the absence of evidence in the record to support his claims of mental retardation, cannot be ignored. *See*, 20 C.F.R. § 416.902 (The definition of "treating source" explicitly excludes a physician or psychologist with whom the claimant's relationship is based "solely on your need to obtain a report in support of your claim for benefits."); Andrews v. Shalala, 53 F.3d 1035, 1042 (9th Cir. 1995) (ALJ properly rejected examining psychologist's report in part because claimant only saw psychologist because he had to in order to obtain benefits and had no interest in pursuing treatment).

It is again important to note that the "capsule definition" of mental retardation set forth in § 12.05 of the Listings states that "[m]ental retardation refers to a significantly subaverage general intellectual functioning with ***deficits in adaptive behavior*** initially manifested during the developmental period (before age 22)." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05(c) (1992)(emphasis added). This capsule definition of mental retardation is fully consistent with the accepted medical standards, which recognize deficits in adaptive functioning as one of the criteria (along with IQ scores of about 70 or below) necessary for a diagnosis of mental retardation. See Diagnostic and

Statistical Manual of Mental Disorders – Text Revision (DSM-TR).  The DSM-TR

further explains:

> The essential feature of Mental Retardation is significantly subaverage
> general intellectual functioning (Criteria A) that is accompanied by
> significant limitations in adaptive functioning in at least two of the
> following skill areas: communication, self-care, home living,
> social/interpersonal skills, use of community resources, self-direction,
> functional academic skills, work, leisure, health, and safety (Criteria B).

DSM-IV 39. Thus, an individual with an IQ score lower than 70 does not necessarily

satisfy the criteria for a diagnosis of mental retardation.  Specifically, "[m]ental

retardation would not be diagnosed in an individual with an IQ lower than 70 if there are

no significant deficits or impairments in adaptive functioning." DSM-IV 39-40.  *See also*

Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992), *citing* Popp v. Heckler, 779 F.2d

1487, 1499 (11th Cir. 1986)(holding a valid IQ score is not necessarily conclusive of

mental retardation where the score is inconsistent with other evidence of claimant's daily

activities).  However, for the reasons stated above, the ALJ's finding in this case that

plaintiff had no extreme and only one marked limitation in any area of functioning is

simply not supported by substantial evidence.  Nor, however, has plaintiff established to

the requisite degree that he suffers a "marked limitation" in two areas of functioning.  *See*

Bowen v. Yuckert, 482 U.S. 137, 146 (1987) (generally, the burden to prove disability in

a Social Security case is on the claimant); Flynn v. Heckler, 768 F.2d 1273, 1274 (11th

Cir. 1985) (Plaintiff bears the burden of demonstrating that the Commissioner's decision,

as affirmed by the district court, is not supported by substantial evidence.).  Plaintiff

cannot simply rest on his general contention that he quit school, which he only attended

once a work at best, because he "couldn't do the work" (Tr. 31). Dr. Tocci illustrated plaintiff's fund of information and comprehension as well as, *inter alia*, plaintiff's ability to abstract and his logical thought organization (Tr. 188-89). As such, the undersigned finds that the ALJ's opinion must be reversed and the case remanded for further evaluation and consideration of plaintiff's alleged learning problem.

V.    Conclusion.

For the reasons stated above, the undersigned concludes and it is therefore

**ORDERED** that the decision of the Commissioner denying plaintiff's benefits was not based on substantial evidence and is due to be and is hereby REVERSED and REMANDED for further evaluation and consideration not inconsistent with this opinion.

This remand makes the plaintiff a prevailing party for purposes of the Equal Access to Justice Act, 28 U.S.C. § 2412, and terminates this Court's jurisdiction over this matter.

Done this 24th day of August, 2010.

/s/ Katherine P. Nelson
KATHERINE P. NELSON
UNITED STATES MAGISTRATE JUDGE